

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| ROBERT L. HOOK, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD82639 |
| | ) | |
| STATE OF MISSOURI, | ) | Opinion filed: September 15, 2020 |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF RANDOLPH COUNTY, MISSOURI
THE HONORABLE TERRY A. TSCHANNEN, JUDGE**

Division Three: Anthony Rex Gabbert, Presiding Judge,
Edward R. Ardini, Jr., Judge and W. Douglas Thomson, Judge

The State of Missouri ("State") appeals from the motion court's judgment sustaining Robert L. Hook's ("Hook") Rule 29.15[1] motion for post-conviction relief following his convictions for first-degree child molestation, first-degree statutory sodomy, first-degree statutory rape, and incest. On appeal, the State claims the motion court clearly erred in granting relief on Hook's claims that trial counsel was ineffective for failing to: (1) object to the admission of testimony from several witnesses concerning R. H.'s ("Victim") out-of-court statements because Victim failed to sufficiently testify pursuant to section 491[2] thereby rendering Victim unavailable and the out-of-court statements inadmissible; (2) investigate and present an expert witness to

---

[1]All rule references are to Missouri Court Rules (2020).
[2]All statutory references are to RSMo 2000 as supplemented through the time of Hook's alleged conduct in 2013.

impeach the forensic interviewer's techniques used with Victim; (3) investigate and present certified copies of medical records from the first examination of Victim after disclosure of abuse which reported no physical injury; (4) object to the admission of the State's DNA report; and (5) object to a handwritten statement written by Victim during direct examination. We reverse.

### Factual and Procedural History[3]

In July 2013, Victim was five years old and resided with her mother and father, Hook. Mother was incarcerated from July 8 through July 15, 2013. On July 11, 2013, Victim was staying with maternal grandmother, Mary Gibson ("Grandmother"). While in the shower, Victim asked Grandmother why she doesn't take a shower with her like Hook does. Grandmother did not respond and Victim did not say anything further about it that evening. The following morning, on July 12, 2013, Grandmother tried to talk to Victim about showering with Hook but Victim did not want to talk about it, said nothing happened, and went off to play. A couple hours later, Victim came to Grandmother and told her that she was ready to talk. Victim then told Grandmother, "daddy put his pee-pee in my pee-pee, and my butt, too." Victim told Grandmother that she was sure about what happened and that she was not lying. Later that same day, Grandmother took Victim to Boone Convenient Care ("BCC") in Moberly where Victim was examined by Dr. Andrea Eden ("Dr. Eden"). Grandmother was present for the exam and Victim repeated her allegations to the doctor. Dr. Eden reported a possible sexual abuse to Child Protective Services ("CPS"). Afterwards, Victim and Grandmother returned to Grandmother's house. Later that day, Hook unexpectedly came to Grandmother's house and told Grandmother that the police wanted to talk to him. Victim then told Hook that she was sorry, that she told about "your pee-pee and my pee-

---

[3]On appeal from the motion court's ruling on a Rule 29.15 motion, we view the facts in the light most favorable to the verdict. *Radmer v. State,* 362 S.W.3d 52, 53 n.1 (Mo. App. W.D. 2012).

2

pee," and gestured to his genital area and then to her own. The record is devoid of Hook's reaction to this statement by Victim.

Later that evening, Victim was placed in foster care with foster parents ("Foster Mother" and "Foster Father," respectively). The next morning, on July 13, 2013, Victim told Foster Mother and Foster Father that Victim was living with them because, while pointing to her vaginal area "her daddy down there (indicating) with his pee-pee." A few days later, Victim repeated this disclosure to Foster Mother and added "in her butt." Victim stated that Hook had told her not to tell but that she told Grandmother and Foster Mother.

Forensic interviewer at the Child Advocacy Center Ashton Eibel ("Eibel") interviewed Victim on two occasions and both were recorded by video. Videos of both interviews were played for the jury. Eibel testified that she was trained not to lead children to answer in a particular way by asking open-ended questions and inviting narrative responses so children can tell what happened in their own language. In the video of the first interview on July 15, 2013, Victim stated that her mother was in jail and she wants her back because "[Hook] is so crazy that he does this (pointing to her genital area) in there my pee-pee . . .it's crazy." Victim stated her "pee-pee" has an "owie." Victim stated her "pee-pee" hurts because it has a "boo-boo" from jumping and falling on her "pee-pee" and "it went blood red." Victim stated that Hook put "his pee-pee . . . in [her] pee-pee" and her butt when she had an "owie" and was bleeding and she said, "no, no, no." She stated that he put his "pee-pee" in her "pee-pee" more than one time. Victim stated this happened at home while her mother was in jail. She stated she was on the couch where she was watching movies with people putting "pee-pee in your mouth" and "putting pee-pee in adult pee-pee." She stated that when Hook put his "pee-pee" in her "pee-pee" it felt bad and hurt. She stated that she

3

told Grandmother what Hook did, she stated, "I told on daddy" and Grandmother was upset. She stated that Hook put his "pee-pee" in her butt one time at home when she was five.

Eibel interviewed Victim again on February 24, 2014, after being notified either by Children's Division or law enforcement that Victim had made an additional disclosure. Eibel stated that additional disclosures are common with child sexual assault victims. In that interview, Victim made the additional allegation that Hook made her "suck his pee-pee." In the video Victim came in and without prompting drew a picture of Hook and herself and said "he did both of the things," "he did two times," his "pee-pee" in her "pee-pee and butt." She explained that the picture is of herself walking away from Hook and telling him to leave her alone but that he didn't leave her alone; that he "did it" two times which she clarified to mean "put his pee-pee in my pee-pee and butt" and "he's in jail for that." She stated that she is telling the truth. She stated that she asked Hook to watch cartoons with her but he put on an adult show which was not good. She stated it was about a girl who put the boy's "pee-pee" in her mouth and sucked it. Victim stated that Hook did that to her; that he asked her to and she said she didn't want to; and that he made her do it to him. She stated that he made her "suck his pee" and she thought pee was going in her mouth. She thinks she got sick from that—a hard cough. She said it was horrible and nasty. She said afterwards they put their clothes on and came out of the bedroom to get a drink. And then Hook got some things "that go in the pee" that looked like soap which he put on her "pee-pee" and his "pee-pee." Victim stated that they stopped because someone knocked on the door so they put on their clothes. She says she told her mother. She repeated that Hook put his "pee-pee" in her "pee-pee" and butt.

Based on statements Victim gave during the July 15, 2013 forensic interview, Detective Tracey Whearty ("Det. Whearty") applied for a search warrant looking for pornographic material

4

and bodily fluids around the couch and in the living room of Hook's residence. The search warrant was executed on July 26, 2013. A videotape was found in the VCR in the living room which was hooked to the TV. When played, the videotape depicted "footage of a female performing oral sex on a male. And then the footage showed close up, zoomed in on the female performing oral sex on the male. And then it showed the male inserting his penis in the female's vagina." Two sections of the couch cushion that appeared to have stains were cut and secured in evidence and sent to a lab for DNA testing to compare with DNA samples previously taken from Victim and Hook.

Stacey Bolinger ("Bolinger"), the supervisor of the DNA case work section of the Missouri State Highway Patrol crime laboratory testified that the DNA test performed on a stain from Hook's couch was done by criminalist Melina Jimenez ("Jimenez"), an employee that Bolinger supervised. Jimenez is no longer employed by the Missouri State Highway Patrol. Bolinger testified that results of the DNA testing of the stain were consistent with Hook's DNA profile. The DNA lab report was admitted as State's exhibit 43. Bolinger stated that the stain had a non-sperm fraction and a sperm fraction. Bolinger testified that the DNA profile of non-sperm fraction is consistent with being a mixture of two people and displayed female gender attributes but both Victim and Hook were eliminated as a source of the major contributing profile of that fraction. The source of the major contributor of the non-sperm fraction was undetermined.

Staci Walters ("Walters") testified that she performed a SAFE (Sexual Assault Forensic Exam) exam of Victim on July15, 2013, in the emergency room. Walters testified that when she asked Victim why she was there Victim replied, "that she had a hurt pee-pee, and she had a red owie . . . she pointed to her rectum with her finger and said, this is where I hurt." She stated during her attempt at a vaginal exam Victim said that it hurt and it was tender to the touch so Walters was not able to view the hymen as well as she wanted. With regard to Victim's rectal area, Walters

5

found Victim to have poor rectal tone, redness in the anal folds, and an area that was linear whitish silver which might have indicated previous scarring. Walters testified that these injuries could have come from injury, hygiene or sexual abuse. Walters stated that in child sexual assault cases it is common not to have injuries. She testified that her findings were inconclusive for abuse.

Dr. Holly Monroe ("Dr. Monroe") performed a SAFE exam on Victim on September 12, 2013, a recheck requested two months prior by Walters. This exam rendered normal results. Dr. Monroe testified that the injuries noted by Walters were not consistent with falling down.

On November 20, 2013, Hook was charged with first-degree child molestation, first-degree statutory sodomy, first-degree statutory rape, and incest. On June 12, 2015, Hook was found guilty after a jury trial of all four charges. On August 20, 2015, Hook was sentenced to ten years' imprisonment on each of the convictions of molestation, statutory sodomy and statutory rape and four years' imprisonment on the conviction of incest with all sentences to be served consecutively.

On November 8, 2016, Hook's direct appeal of his convictions to this court was denied. *State v. Hook*, 503 S.W.3d 294 (Mo. App. W.D. 2016). On February 6, 2017, Hook filed his *pro se* Rule 29.15 motion to vacate, set aside or correct the judgment or sentence. On June 19, 2017, appointed counsel filed Hook's Amended Rule 29.15 Motion to Vacate Judgment and Sentence ("Amended Motion") alleging numerous grounds of ineffective assistance of trial counsel and ineffective assistance of appellate counsel. On June 21, 2017, the trial court recused itself and requested transfer. On June 27, 2017, the case was transferred by the Supreme Court to the motion court. The motion court held an evidentiary hearing ("PCR hearing") on October 19 and November 6, 2018. On February 21, 2019, the motion court entered its Judgment and Decree ("Judgment") sustaining five claims of ineffective assistance of trial counsel. The motion court vacated Hook's convictions and ordered a new trial. State appeals.

**Standard of Review**

We review a motion court's ruling on a Rule 29.15 post-conviction motion for the limited determination of whether the findings of fact and conclusions of law are clearly erroneous. *Meiners v. State*, 540 S.W.3d 832, 836 (Mo. banc 2018) (citing Rule 29.15(k)). The motion court's findings and conclusions are clearly erroneous only if a review of the entire record leaves this Court "'with a definite and firm impression that a mistake has been made.'" *Id.* (citation omitted).

**Analysis**

To be entitled to post-conviction relief for ineffective assistance of counsel, Hook must satisfy the two-prong test of *Strickland* by a preponderance of the evidence. *Williams v. State*, 490 S.W.3d 398, 403 (Mo. App. W.D. 2016) (citing *Strickland v. Washington* 466 U.S. 668, 687 (1984)). First, Hook must show that counsel's performance was deficient by falling below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. If counsel's performance was deficient, Hook must then prove that he was prejudiced by counsel's deficiency. *Id.* at 687. Prejudice occurs when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* There is a strong presumption that counsel's conduct was reasonable and effective. *Id.* at 689. To overcome this presumption, the movant must point to specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of effective assistance. *Id.* at 690. Strategic choices made after a thorough investigation of the law and the facts are virtually unchallengeable. *Id.*

"A movant must satisfy both prongs of the *Strickland* standard to obtain postconviction relief as a result of ineffective assistance of counsel." *Hounihan v. State*, 592 S.W.3d 343, 348 n.3

7

(Mo. banc 2019) (citing *Anderson v. State*, 564 S.W.3d 592, 600 (Mo. banc 2018)). Because a claim of ineffective assistance of counsel must be rejected if the movant fails to satisfy *either* the performance or prejudice prong,

> there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Strickland*, 466 U.S. at 697.

The State presents five points on appeal alleging the motion court clearly erred in granting relief on Hook's claims that trial counsel was ineffective. In Point I, the State asserts that the motion court erred in finding trial counsel ineffective for failing to object to the admission of testimony from several witnesses concerning Victim's out-of-court statements. In Point II, the State asserts that the motion court erred in finding trial counsel ineffective for failing to investigate and present an expert witness to impeach the forensic interviewer's techniques used with Victim. In Point III, the State asserts that the motion court erred in finding trial counsel ineffective for failing to investigate and present certified copies of medical records from BCC. In Point IV, the State asserts that the motion court erred in finding trial counsel ineffective in failing to object to the admission of the State's DNA report. And, in Point V, the State asserts that the motion court erred in finding trial counsel ineffective for failing to object to a handwritten statement written by Victim during direct examination.

### Point I—Victim's Out-of-Court Statements

In Point I, the State claims that the motion court clearly erred in granting relief on Hook's claim that trial counsel was ineffective for failing to object to testimony of the Victim's out-of-

8

court statements from Grandmother, Foster Mother, Eibel, Walters, and the two video recorded forensic interviews because there was neither deficient performance nor prejudice where the foundation for the admission of evidence was met under sections 491.075 and 492.304 in that the Victim testified and was subject to cross-examination rendering such an objection meritless. We agree.

"Section 491.075 governs the admissibility of out-of-court statements made by child witnesses." *State v. Hawkins*, No. WD 81946, 2020 WL 1860727, at *4 (Mo. App. W.D. Apr. 14, 2020). "Section 491.075 provides that a child's, otherwise inadmissible, out-of-court statement made in relation to an offense under Chapter 566 is admissible to prove the truth of the matter asserted when: '(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and (2)(a) The child or vulnerable person testifies at the proceedings[.]'" *Id.* (quoting section 491.075.1). "Our courts have repeatedly held that 'admitting a child-victim's out-of-court statements in evidence pursuant to section 491.075 *is not a violation* of due process, equal protection of the law or the right to confrontation under the United States Constitution *in a case in which the victim is available and produced at trial.*'" *Id.* (quoting *State v. Hester*, 801 S.W.2d 695, 697 (Mo. banc 1991)) (citing *State v. Wright*, 751 S.W.2d 48, 51 (Mo. banc 1988)); *see also State v. Justus*, 205 S.W.3d 872, 881 (Mo. banc 2006); *State v. Perry*, 275 S.W.3d 237, 243 (Mo. banc 2009); *State v. Biggs*, 333 S.W.3d 472, 477-78 (Mo. banc 2011). Similarly, section 492.304 pertains to the two video recorded forensic interviews by Eibel of the Victim and provides that visual and aural recordings of a verbal or nonverbal statement of a child under the age of fourteen and alleged to be the victim of a sexual offense are admissible if the child testifies at trial.

9

It is undisputed that the requirements of section 491.075.1(1) were met. On April 9, 2015, a section 491 hearing was held at which Grandmother, Walters, and Foster Mother testified. The parties stipulated to the admission of the video recorded forensic interviews provided that Eibel would testify. The State stated that section 491.075 would be satisfied because she intended on calling Victim to testify. The trial court found "the time, content, circumstances, and statements, as well as the victim will be available to testify indicates that 491.075 has been satisfied."

It is also undisputed that the Victim took the stand, was sworn in, gave testimony, and was made available for cross-examination. Here, the central issue sustained by the trial court, is whether the Victim testified *sufficiently* to satisfy section 491.075. She did.

At trial, the Victim testified, in pertinent part:

Q [State]: Can you spell your name into the microphone for me?

A [Victim]: [Victim spells first name]

Q: Okay, and what's your last name?

A: [Victim spells last name]

. . . .

Q: Okay. So how old are you?

A: Seven.

Q: Do you know when your birthday is?

A: June 4th.

Q: So you just had a birthday?

A: (Nods.)

Q: Do you know where you live right now? Do you know what city you live in? I didn't hear that.

A: Gladstone.

10

. . . .

Q:     Okay, great. And the most important thing I want you to do is tell the truth. Can you do that?

A:     (Nods.)

Q:     Is that a yes or a no?

A:     Yes.

Q:     Okay. If I said that this jacket I'm wearing right here is pink, is that the truth, or is that a lie?

A:     A lie.

Q:     Okay, so do you promise that you're going to tell us the truth here today?

A:     (Nods.)

Q:     Is that yes or no?

A:     Yes.

Q:     Okay, and also if I ask you something and you don't understand me, can you just go ahead and tell me you don't understand?

A:     Yes.

Q:     There you go, you're doing good. Okay, is it okay if I talk a little bit about your family?

A:     Yes.

Q:     And who do you live with right now?

A:     Wayne and Jessica.

Q:     Do you remember a time when you lived in Moberly with your mom and dad?

A:     Yes.

Q:     Do you remember how old you were then?

A:     No.

Q:     Okay, that's okay. And do you remember talking to someone named Ashton?

A:     (Shakes head.)

Q:     You don't remember that?

A:     No.

Q:     Okay, well what we're going to talk about today is about your dad, and things that happened with your dad, okay?

A:     Yes.

Q:     And can you describe what your dad did to you back when you lived in Moberly? So you don't want to say it in the microphone?

A:     (Nods.)

Q:     If we move a little closer to those people over there so you don't have to use the microphone, would that work?

A:     I don't want to tell people.

Q:     Okay. Do you remember telling other people before about what your dad did to you?

A:     (Whispers.)

Q:     Do you remember telling your real mom?

A:     (Nods.)

. . . .

Q:     Do you remember a time when your mom was in jail?

A:     (Shakes head.)

Q:     No? Can you - Let me ask you this. Do you remember what your dad did to you?

A:     (Nods.)

Q:     Okay, and now say that out loud.

A:     Yes. But I don't want to say it.

12

Q:     All right. Why don't you hold tight for a second.

. . . .

Q:     []Can I just ask you just a few more questions about your dad, is that okay? Can I just ask you this, just answer me yes or no. Do you remember what your dad did to you?

A:     (Nods.)

Q:     Can you say yes or no?

A:     Yes.

Q:     So you do remember?

A:     (Nods.)

Q:     And will you tell us a little bit about that? You say you don't want to say it in the microphone?

A:     (Nods.)

Q:     Would you write it down for me? Would that be something you'd be willing to do?

A:     (Nods.)

Q:     Okay, if I give you a piece of paper and a pen, can you write it down for us? Just write down whatever you remember about it. Do you have a question? How do you spell what? Just spell it the best you can, okay? Can you tell me what me what you're trying to spell?

A:     Put.

Q:     Butt?

A:     No, put.

Q:     Put, okay. Are you finished?

A:     (Nods.)

Q:     Can I see that? Okay. Is it okay if I say what this says, so you can make sure I'm reading it right if I say it out loud? You don't want me to?

A:     (Shakes head and whispers.)

13

Q: So can I just ask you what that very first word is? Is that first word "he", is that second word "put"? Can I say any more? You don't want me to say?

A: (Shakes head.)

[State]: I'm not going to ask her any more questions.

[Defense]: No cross, Your Honor.

The State marked the Victim's writing state's exhibit 49 ("Exhibit 49") and published it to the jury without objection by trial counsel. Exhibit 49 appears to say, "He pet hes pp inn but in me pp inn but."

In the Amended Motion, Hook claimed trial counsel was ineffective in failing to object and move for mistrial when Victim refused to testify about the allegations she made against him in violation of sections 491.075 and 492.304.

In its Judgment, the motion court found that trial counsel's performance did not conform to the degree of skill and care of a reasonably competent attorney in that as soon as Victim could not articulate responses about her disclosures trial counsel should have moved to strike all of the section 491 evidence because "for all intents and purposes, the [Victim] was not available to testify as required by 491.075." The motion court cited no authority for its conclusion that the Victim's testimony rendered the Victim unavailable for purposes of section 491.075. The motion court's conclusion is contrary to Missouri law.

"[O]ur Supreme Court held for purposes of section 491.075, a child victim witness is 'unavailable' when 'shown to be (1) deceased, (2) beyond the reach of process, (3) insane or physically ill; (4) kept away by the connivance, collusion or consent of the other party; or (5) where due diligence to secure the witness's attendance by compulsory process has failed.'" *Hawkins*, No. WD 81946, 2020 WL 1860727 at *5 (quoting *Hester*, 801 S.W.2d at 696).

14

In *Hawkins*, this Court recently analyzed when a child victim witness was available. There, the victim refused to state name or age, but drew a picture on a white board and indicated where she was touched and nodded that the person that did this was in the courtroom. *Id.* at *2. Several witnesses testified as to Victim's disclosures. *Id.* at *3. Defendant claimed error in the admission of victim's out-of-court statements on the basis that victim failed to sufficiently testify for purposes of complying with section 491.075. *Id.* This Court rejected defendant's argument, finding "[v]ictim was available and produced at trial, and testified in a manner consistent with section 491.075's requirements." *Id* at *5. We reasoned, the victim took the stand, was sworn-in to testify, and was questioned by the State and the defense. *Id*. The victim drew a picture indicating where she was touched inappropriately and indicated that the person who did it was in the courtroom. *Id.* Noting that many of her answers were nonverbal, this Court held that "[n]onverbal responses are answers" and did not render victim unavailable for purposes of section 491.075. *Id.* This Court noted that while the victim might be a reluctant witness, "reluctance to testify is not the equivalent of unavailability to testify." *Id.* (quoting *Hester*, 801 S.W.2d at 697). See also *State v. Tanner*, 220 S.W.3d 880 (Mo. App. S.D. 2007) (held child victim's testimony at statutory sodomy trial was sufficient to satisfy section 491.075 even though victim was reluctant to testify); *Biggs*, 333 S.W.3d at 477 (child victim witness testified that he remembered nothing of abuse or of videotaped interview; Supreme Court held that unsatisfactory testimony does not render witness unavailable); *State v. Galindo,* 973 S.W.2d 574 (Mo. App. S.D. 1998) (victim was produced and testified, albeit mostly nonverbally, and was available for cross-examination). Likewise, in *Hester,* the child witness was deemed available even though the witness only "answered two or three questions [asked by the prosecution], then failed to respond to additional questions," before being excused by the court. *Hester*, 801 S.W.2d at 697.

It is important to note that the motion court did not have the benefit of our analysis in *Hawkins* as it was decided by this Court on April 14, 2020, more than a year after the motion court entered its Judgment in this matter. *Hawkins*, No. WD 81946, 2020 WL 1860727. Although this Court gives deference to the motion court, reviewing this case through the lens of *Hawkins* yields an erroneous result by the motion court. Here, the Victim testified more substantively than the witnesses in both *Hawkins* and *Hester*. Victim took the stand, was sworn-in to testify and testified about her name, age, birthday, city of residence, and with whom resided. Victim also testified that she remembered living with her parents, that she agreed to tell the truth, that she remembered telling her mother what her father did to her, and that she remembered what her dad had done to her but that she did not want to say it out loud. Victim agreed to write down what her father had done to her on paper. Like the victim witnesses in *Hester* and *Hawkins*, this is not a case where the Victim refused to testify. Thus, because the trial court complied with section 491.075 and Victim was made available to testify, an objection to the testimony of the out-of-court statements would have failed. Trial counsel cannot be held ineffective for failing to make non-meritorious objections. *Woods v. State*, 458 S.W.3d 352, 362 (Mo. App. W.D. 2014).

In support of the motion court's findings, Hook cites *Schnelle v. State*, 103 S.W.3d 165, 168 (Mo. App. W.D. 2003) (ineffective assistance where trial counsel made no objection to defendant's testimony being stricken upon his refusing to testify further) and *State v. Blair*, 638 S.W.2d 739 (Mo. banc 1982) (defendant claimed trial court erred in failing to grant mistrial when state's witness invoked the fifth amendment, foreclosing the defense from cross-examination). Both *Schnell* and *Blair* are wholly inapplicable to this case in that they do not involve child victim witnesses nor the application of section 491.075.

16

Moreover, not only is the finding that trial counsel was ineffective in failing to object to the admission of 491 evidence and request a mistrial because the victim "refused to testify" incorrect in light of *Hawkins,* it altogether confuses the purpose for the Victim's presence at trial.  As stated in Respondent's brief, the trial court sustained "Claim 8(c)(5) – [ineffective assistance] of trial counsel for failing to object and request a mistrial when [Victim] refused to testify about the allegations at trial".  However, the victim must be present at trial for 491 purposes not so the State can make its case through Victim's live testimony, but rather to make the Victim available for cross-examination.[4]  Here, defense counsel did not even attempt to cross-examine the Victim.  He waived the opportunity.[5]  When counsel makes the strategic decision to waive the right to cross-examine the 491 victim, a claim or finding of ineffective assistance based on the witness 'refusing to testify' simply cannot lie.  Said another way, it is not direct examination that is the focus of determining whether the victim "sufficiently" testified to support admission of 491 evidence.  Rather, it must be that the defendant is unable to elicit sufficient testimony on cross-examination for there to be an issue about admitting 491 evidence.

Because we find Victim's testimony sufficient to satisfy section 491.075, especially in light of our recent decision in *Hawkins*, the motion court clearly erred as a matter of law in finding trial

---

[4]"[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [her] prior testimonial statements." *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004).  In *Hawkins*, the "sufficiency" of the testimony issue was based on cross-examination, not direct.

[5]This is not to say that waiving the right to confront the witness through cross-examination is *per se* ineffective assistance in and of itself.  As discussed at length in Point V, trial counsel's desire to not appear to be 'beating up' on a five-year-old victim is a strategy.  Here, trial counsel had 22 years of experience as a criminal attorney and had handled approximately 50 to 100 child sex cases.  His sense of how a jury would react to cross examination of such a witness is not to be discounted.

counsel ineffective for failing to object to testimony of Victim's out-of-court statements on the basis that Victim's limited testimony rendered her unavailable.

Point I is granted.

### Point V—Victim's Handwritten In-Court Statement

We address Point V next as it is closely related to Point I. For this point, the State asserts that the motion court clearly erred in finding trial counsel ineffective for failing to object to Exhibit 49, Victim's handwritten note made during her direct testimony, because the exhibit was admissible, and, therefore, Hook failed to prove deficient performance or prejudice. We agree.

As discussed in Point I, at trial during direct examination, Victim wrote down what Hook did to her. This became Exhibit 49, and reads, "He pet hes pp inn but in me pp inn but." Trial counsel did not cross-examine Victim and did not object to the admission of Exhibit 49 stating, "I had a chance to cross-examine this little girl in court, so there's not going to be any objection."

At the PCR hearing, trial counsel testified that he did not see that there was an objection to Exhibit 49. He explained:

> Q. (State): What would have been your basis for objecting to the handwritten or hand drawn statement by the child?
>
> A. (Trial counsel): Well, listen, when this happened during court, everybody was taken off guard. It was a very uncomfortable situation, so I guess -- I mean I guess there's a hearsay argument, I guess. I don't know, but the person's right there writing it down.
>
> Q. So –
>
> A. I didn't see an objection even if there was one.
>
> Q. If you had chosen to make the objection, what were you concerned about?
>
> A. Looking like I was beating up on the five-year-old.

The motion court based its finding that trial counsel was ineffective for failing to object to Exhibit 49, on the same reasoning that we rejected in our analysis of Point I, that Victim was

18

unavailable for purposes of section 491.075 rendering other testimonial evidence inadmissible. The motion court stated that once the State abandoned the Victim as a witness, Exhibit 49 was not admissible for any purpose, and, therefore, trial counsel was deficient in failing to object to its admission as well as to its creation. As such, the motion court found that the State failed to get the Victim's testimony and, therefore, the admission of Exhibit 49 was in violation of Hook's right to confrontation. Because we find that the motion court erred as a matter of law in finding that Victim did not testify, the motion court's findings on this point are also rejected. The Victim testified in accordance with section 491.075 and was subject to cross-examination regarding her testimony, as well as Exhibit 49, had trial counsel chosen to do so. Trial counsel cannot be held ineffective for failing to make non-meritorious objections. [6] *Woods*, 458 S.W.3d at 362.

The motion court also found that Exhibit 49 was obtained by leading and coercing the Victim without any further reference. Our review of the testimony, as set out in Point I, refutes this characterization. Because we find Victim's testimony sufficient to satisfy section 491.075, the motion court clearly erred as a matter of law in finding trial counsel ineffective for failing to object to Exhibit 49 on the basis that it violated his right to confrontation.

Point V is granted.

### Point II—Expert Witness

In Point II, the State claims that the motion court clearly erred by granting relief on Hook's claim that trial counsel was ineffective for failing to call Dr. Rosalyn Shultz ("Dr. Schultz") as an expert witness to impeach forensic interviewer Eibel's techniques because the choice of witnesses

---

[6] Further, trial counsel's testimony as to not wanting to look "like I was beating up on the five-year-old" is a valid strategic decision when a child is on the witness stand. Here, it is readily apparent the Victim was having difficulty on the stand and that little was going to be gained by cross-examination. Concern over the jury's perception of "beating up" on such a Victim is valid strategy. Though not discussed because this testimony was more fully developed in this Point V, trial counsel's aforesaid strategic decision to not look "like I was beating up on the five-year-old" is also applicable to Point I.

19

is presumptively reasonable and "virtually unchallengeable" trial strategy and Hook failed to show deficient performance or prejudice. We conclude that the motion court clearly erred in finding that Hook was prejudiced by counsel's failure to present Dr. Schultz's testimony, even assuming that the failure to present her testimony constituted deficient performance. We accordingly grant Point II.

In his Amended Motion, Hook claims trial counsel was ineffective in failing to call Dr. Schultz as an expert witness to challenge the hearsay statements of Victim. These statements came into evidence through interviewers, Grandmother, Foster Mother and the videotaped forensic interview. He claims Dr. Schultz would have testified as to best practices in investigations of sexual abuse, and the problems with the way the forensic interviews of Victim were done in this case. Specifically, that Eibel ignored information given by the Victim that offered an additional possibility as to how her vagina was injured. Hook claims he was prejudiced as a result because testimony by Dr. Schultz, or a similarly qualified expert, at trial would have allowed counsel to challenge the credibility of statements made by Victim and would have created reasonable doubt in the minds of jurors as to Hook's guilt such that there is a reasonable probability that the outcome of the trial would have been different. The motion court agreed.

At the PCR hearing, Dr. Schultz and trial counsel both testified. Dr. Schultz testified about her extensive training in forensic interviews of child victims of sexual abuse. She testified that she had been contacted by Hook's two prior attorneys.[7] In February 2014, the first attorney contacted and engaged her for evaluation of the criminal investigation, and regarding the quality of Eibel's interviews with Victim and whether best practices were used. In May 2014, the second

---

[7]Hook was represented by three attorneys. The first prepared for trial as described herein. The second attorney replaced the first and further prepared the case for trial. Trial counsel was Hook's third attorney and entered his appearance eight months before trial.

attorney sought her available dates to testify at both the 491 hearing and the trial. Trial counsel did not contact Dr. Schultz at all.

Had she been contacted, she would have been able to offer an opinion as to the quality of the investigation and an opinion regarding whether best practice guidelines were followed. Dr. Schultz testified that the best practice guidelines are nationally developed by several organizations for forensic and investigative interviews of child victims. These guidelines provide a framework for professional interviewers, are well respected, and used throughout the United States. After reviewing the records and interviews in Hook's case, Dr. Schultz found significant difficulties with the investigation and the forensic interviews of the Victim. She stated such guidelines were not adequately followed, specifically: the timing and circumstances were not flushed out; a family history of what was occurring at that time of the alleged incident was not obtained; a medical history of the Victim was not obtained; the interviewer did not follow up on the "owie" described by Victim and potential causes of same (see, *supra*); and, Dr. Eden was not interviewed. With regard to Eibel's interviews with Victim, Dr. Shultz stated the best practices guidelines were not followed. Dr. Schultz identified several specific ways in which Eibel's interviews failed to follow best practices, including her failure to follow up on a bike accident as a potential source of Victim's vaginal or anal injuries.

Trial counsel testified that when he represented Hook at trial he was in private practice but represented Hook on a contract basis with the public defender's office. Trial counsel testified that he had been an attorney for 22 years. He stated that he had been in private practice for 12 years and previously worked for the public defender's office where he held the position of district defender twice. Trial counsel testified that he had handled 50 to 100 child sex cases and tried approximately a dozen. He stated that he began representing Hook in October 2014, and

acknowledged that he would have received and reviewed the public defender's file. He stated that he knew from the file that Dr. Schultz had been hired by Hook's previous counsel. He stated that he was aware of the purpose for her but that he "rejected that outright as a witness" without contacting her or knowing what testimony she might offer. He stated that he did not know about the best practices guidelines. He stated that he "made an assumption about the general stuff that she would probably be testifying to, and I rejected that as I wasn't going to use that witness or that strategy." When asked how often he had used a witness like Dr. Schultz, trial counsel replied, "Never. I mean I've used experts but not in a child sex case … to challenge whether or not the interviewing techniques were leading or stuff like that. I've never used an expert for that purpose." When asked if he recalled that he challenged Eibel at trial about her interview with Victim, trial counsel testified, "[I]f there were places I thought she was leading, I would probably challenge her on it. I usually think if an interviewer is leading a kid that it's pretty obvious to most adults that's what's going on."

In the Judgment, the motion court found that trial counsel was deficient and that trial counsel's deficiency prejudiced Hook. The motion court noted that Dr. Schultz testified at the PCR hearing as to her opinion as to the importance of following best practices guidelines for investigative interview strategies. Dr. Schultz stated Eibel's interviews were problematic because they were not done in accordance with best practices guidelines, and, as such, could have affected the outcome of the case. Dr. Schultz stated that Eibel ignored information about an injury from a bike accident that could have been an alternative possibility for Victim's injuries. Finally, the motion court found that Dr. Schultz had been contacted by Hook's two prior defense attorneys as to testifying as an expert at trial but was never contacted by trial counsel.

In finding trial counsel's performance deficient, the motion court stated that "[trial counsel], despite knowing the thoughts of Movant's first two attorneys, made absolutely no effort to make an educated decision as to whether to utilize Dr. Schultz. . . . that [trial counsel] simply rejected the use of Dr. Schultz out of hand. Quite frankly, [trial counsel] never even offered an opinion as to how this was a strategic decision on his part." The motion court continued, finding that Dr. Schultz's testimony was impressive, and "[t]here is no doubt in this Court's mind that her testimony would have aided [Hook's] defense. Her testimony, at a minimum, would have provided valuable impeachment of Ms. Eibel and the videos she produced." The motion court held, "counsel's performance in regards to this evidence in no way conformed to the degree of skill, care, diligence of a reasonably competent attorney."

The motion court also found that Hook was prejudiced by trial counsel's performance in that "there was no conclusive physical or scientific evidence linking Mr. Hook to the child's allegations. The State's case relied on the child's disclosures which to a large degree, were generated by Ms. Eibel. This evidence was the very flashpoint of the State's case. It was here that [trial counsel] had to attack and focus on undermining the State's charges. [Trial counsel], however, did nothing to attack this evidence and offered no credible explanation for his inactions. [Hook] was clearly prejudiced by [trial counsel's] lack of effort to undermine the State's evidence with a retained and engaged expert such as Dr. Schultz. . . [Trial counsel] was neither diligent nor had any strategy for his failure to use Dr. Schultz."

In this case, counsel made the decision not to call a known and available witness, who would cast doubt on the reliability of some of the Victim's most significant disclosures of abuse, without ever contacting that witness or determining what testimony the witness would be able to offer. The motion court found counsel's decision in this regard to be deficient. *Cf. Vaca v. State*,

23

314 S.W.3d 331, 336-37 (Mo. banc 2010). We need not determine the correctness of the motion court's conclusion that Hook satisfied *Strickland*'s "performance prong" with respect to this claim, however. Even assuming that counsel's decision not to call Dr. Schultz to testify constituted deficient performance, the motion court clearly erred in concluding that presenting Dr. Schultz's testimony would have created a reasonable probability of a different outcome.

We note at the outset that a large portion of Dr. Schultz's testimony at the PCR Hearing concerned the investigation of Victim's allegations of abuse by law enforcement, or by the Children's Division. We do not believe Dr. Schultz's critique of the investigative techniques employed by law enforcement, or by Children's Division staff, falls within the allegations of ineffective assistance of counsel contained in Hook's amended motion. To the contrary, Claim 8(a) of the amended motion alleges that trial counsel was deficient for failing to "call an expert on children's advocacy center interviews and interviewing techniques for sexually abused children." The amended motion does not allege that counsel was deficient for failing to call an expert to evaluate the investigative techniques used by others, and any such claim is accordingly waived. "In actions under Rule 29.15, any allegations or issues that are not raised in the Rule 29.15 motion are waived on appeal. Pleading defects cannot be remedied by the presentation of evidence and refinement of a claim on appeal." *Shockley v. State*, 579 S.W.3d 881, 899 (Mo. banc 2019) (citations and internal quotation marks omitted).

Second, and consistent with the allegations in the amended motion, Dr. Schultz's testimony only evaluated the techniques employed during the Victim's two forensic interviews conducted by Eibel; Dr. Schultz did not offer any testimony to suggest that the circumstances surrounding the Victim's *other* disclosures rendered those statements unreliable. Evidence was presented at trial concerning consistent disclosures Victim made to Grandmother, Hook, Dr. Eden at BCC, Foster

24

Mother, and Foster Father, all *before* her interview with Eibel. Nothing in Dr. Schultz's testimony would have impacted the jury's consideration of these multiple, and consistent, disclosures.

Even as to the forensic interviews, Dr. Schultz acknowledged on cross-examination that she was not testifying that Victim's disclosures during the forensic interviews were "contaminated," or rendered unreliable. Instead, she merely opined that the deficiencies she noted "could contribute to problems that could contaminate the outcome of the case." Although we do not question the motion court's conclusion that Dr. Schultz was qualified to provide admissible expert testimony in this case, we also find it significant that she acknowledged on cross-examination that she had never worked in a child advocacy center, and had never actually conducted the type of forensic interviews which she was being asked to evaluate. The qualified nature of Dr. Schultz's opinions, and her lack of direct experience conducting such forensic interviews, limits the probative value of her testimony.

It is also significant that, apart from generalized testimony concerning best-practice guidelines for forensic interviews, Dr. Schultz offered only a limited number of specific critiques of the interviews conducted by Eibel. The most prominent specific criticism Dr. Schultz offered was that Eibel failed to follow up when Victim referred to an accident in which she had injured her vaginal area or anus, which could have offered an alternative explanation for any physical symptoms she was experiencing; Dr. Schultz noted that, on one instance where Victim mentioned this accident, Eibel actually redirected her back to talk about Hook's actions. Yet trial counsel specifically highlighted Eibel's failure to follow up on Victim's accident, and her refocusing Victim on Hook, both in his cross-examination of Eibel, and in closing argument.

Another criticism Dr. Schultz offered was that, when Victim stated that Hook had placed his "pee pee" in her "pee pee," Eibel (inappropriately) reminded Victim that she had previously

also stated that he had put his penis in her "butt." Once again, trial counsel specifically questioned Eibel about this precise issue on cross-examination.

We also note that trial counsel cross-examined Eibel about, and/or highlighted in closing argument, several other concerning aspects of Victim's forensic interviews: that the Victim said that her birthday was "right now" when it was weeks away; that the five-year-old Victim said that she would be entering "fourth grade," which was plainly inaccurate; that the Victim said at the outset of her second forensic interview that she and Eibel had spoken "yesterday" when it was in fact months earlier; that Victim seemed unusually eager in her second interview to immediately talk about Hook's abuse, and stated that "I'm supposed to tell" about specific actions by Hook; and that Eibel failed to ask Victim about an incident in the shower, even though that was the initial disclosure which triggered Grandmother's concerns.

We also believe Dr. Schultz's credibility would have been seriously diminished by her inaccurate reliance on a supposed instance of bias by Eibel, which did not in fact occur. In her testimony at the PCR Hearing, Dr. Schultz stated that, in describing the goals of a forensic interview, Eibel had stated "that one of the goals was to . . . corroborate the allegation," which Dr. Schultz considered to be inconsistent with the neutrality of a forensic interviewer. Hook's post-conviction counsel then purported to quote from page 131 of the trial transcript, where Eibel supposedly testified that one of the goals of the interview was "to collect information for the team members that's hopefully corroborative of the alleged allegation or information." *Id.* Dr. Schultz agreed that this testimony was evidence of bias. The problem is, however, that this is not what Eibel actually said. Instead, on page 131 of the trial transcript. Eibel testified:

> A forensic interview is a structured conversation with a child, intended to elicit detailed information about an event the child may have witnessed or experienced. The goal of a forensic interview is to obtain as much information as possible, ***to better clarify the allegations in a child abuse case***.

26

(Emphasis added.)

Dr. Schultz's other critiques of the forensic interviews (other than those which were inaccurate or which were addressed by counsel at trial) would not have created a reasonable probability of a different outcome at trial. For example, Dr. Schultz criticized Eibel's use of pronouns such as "it" and "that" in following up on Victim's disclosures, rather than using Victim's own words. Although she stated that this departed from best practices in interviewing very young children, Dr. Schultz offered no explanation as to how Eibel's use of pronouns could have affect the reliability of the interviews, and we perceive none. Dr. Schultz also emphasized that, on one occasion in Victim's second interview, Eibel praised Victim for doing a "good job." Dr. Schultz testified that it was inappropriate for an interviewed to give a child positive reinforcement for disclosures of abuse. Yet Dr. Schultz acknowledged on cross-examination that she did not look at the context in which the praise was given, to see if it appeared to influence Victim's behavior or statements.

For all of these reasons, we conclude that, even if counsel had called Dr. Schultz to testify and impeach Eibel's techniques, Hook failed to demonstrate a reasonable probability that the outcome of trial would have been different. The motion court clearly erred in reaching a contrary conclusion.

Point II is granted.

**Point III—Victim's Medical Records**

In Point III, the State claims that the motion court clearly erred in granting relief on Hook's claim that trial counsel was ineffective because he did not obtain certified copies of Victim's medical records from BCC for trial. We agree.

27

In his Amended Motion, Hook claimed that trial counsel was ineffective for failing to get certified copies of Victim's complete medical file from BCC because the discharge report from July 12, 2013, showing no physical findings of abuse, would have created a reasonable doubt in the minds of the jurors as to whether Hook was guilty as charged. The motion court agreed.

At the PCR hearing, trial counsel testified that he was aware of the BCC records before trial but not its significance, stating, "I just missed it." He admitted the records were part of the file when it was given to him. Trial counsel stated that he did not request a business records certification but that he should have done so. Trial counsel testified that upon realizing mid-trial that he had the BCC records in his file, he wanted to get them into evidence, and attempted to do so by trying to cross-examine Dr. Monroe with the records but the State's objection to his efforts was sustained.

The BCC records reflect, in pertinent part, that on July 12, 2013, Grandmother brought Victim in for alleged sexual abuse. It lists as chief complaint/reason for visit:

> Maternal grandma present who states that pt told her today that her dad was touching her private parts. The incident occurred on 7/10. Pt states she was taking a shower with her dad and he touched her vaginally. Pt then stated without prompting from the grandma that her dad took her to the living room and put his "pee pee area" in her butt and her "pee-pee area." This caused her discomfort at the time but she denies pain currently.

The BCC records indicated no physical injuries were found.

The motion court found the July 12, 2013 BCC records showing no physical findings of abuse could have created a reasonable doubt in the minds of the jurors as to Hook's guilt because they contradict Walters' findings of the SAFE exam and the opinions expressed by Dr. Monroe at trial. The motion court noted that the State alleged the allegations occurred between July 8 and July 12, 2013. The BCC exam occurred on July 12, 2013, the very day that Victim disclosed the abuse to Grandmother. Dr. Eden at BCC did the physical examination of Victim and found the

28

vaginal and rectal area to be normal. "Dr. Eden's examination found none of the concerns identified by Ms. Walters. Ms. Walters' exam was done at least three (3) days after [Hook] no longer had access to the child."

The motion court found trial counsel absolutely deficient in his performance in failing to investigate, use for impeachment, and introduce certified copies of the BCC records at trial. The motion court noted that trial counsel knew the Victim had been taken to a doctor prior to the hotline call because Grandmother disclosed this at the 491 hearing more than two months before trial. The motion court stated, "[Trial counsel's] failure to present this evidence to the jury in no way conforms to the degree of skill, care, and diligence of a reasonably competent attorney."

The motion court found that trial counsel's deficiency was prejudicial. "This was the first of three (3) physical examinations over a two (2) month period performed on the child in connection with her allegations. Counsel's deficiency was prejudicial to Movant because this examination was performed one (1) day after the child allegedly told [Grandmother] that [Hook] showered with her and on the same day that she disclosed sexual abuse. The motion court stated that Dr. Eden's notes reflect normal findings of the vaginal and rectal area noting that there were no findings of "discoloration, bruising, relaxed tone, or discomfort of any kind." The motion court held, "[t]he lack of physical findings less than one (1) week after the offenses were alleged to have occurred is highly significant and was important for the jury to hear because it would have completely impeached the testimony of two (2) witnesses that performed SAFE examinations on the child . . . testimony that was, by their own admission, 'inconclusive'[8] as to sexual abuse. Worse yet, State's witness Dr. Monroe, who performed the final SAFE exam on the child, testified at trial

---

[8]Walters testified that the injury she observed to Victim, while not conclusive of abuse, would be consistent with abuse.

that the best time to find injuries is as soon as possible after the assault because children heal very quickly."

We recognize that trial counsel candidly acknowledged at the PCR Hearing that he had simply overlooked the significance of the lack of physical findings in the BCC records, and the trial transcript reflects that counsel attempted – unsuccessfully – to introduce those records through his cross-examination of Dr. Monroe. But even if counsel's performance was deficient in this regard, the motion court clearly erred in finding that Hook had establish *Strickland* prejudice.

As an initial matter, it bears emphasis that the BCC records themselves document an *additional*, early disclosure of abuse by Victim. The narrative portion of the report states that "Pt [(*i.e.*, "patient")] states she was taking a shower with her dad and he touched her vaginally. Pt then stated without prompting from the grandma that her dad took her to the living room and put his 'pee pee area' in her butt and her 'pee-pee area.'" Thus, the report documents an incident of inappropriate touching in the shower (an incident not documented in Victim's forensic interview), as well as Victim's *unprompted* disclosures of anal and vaginal intercourse. This additional, early, documented disclosure would have provided important additional corroboration of Victim's allegations, if the BCC records had been introduced in evidence.

In addition, it is not accurate for Hook to suggest that Victim was entirely asymptomatic in the BCC visit. To the contrary, the report notes that Victim was experiencing abdominal pain, vaginal itching and discharge, and dysuria (pain on urination). Particularly in the context of a young child who may not be articulate concerning symptoms they are experiencing, we believe a jury could easily find that the symptoms Victim reported during the BCC visit were generally consistent with those identified in her first SAFE examination.

30

Further, it bears emphasis that the records Hook now claims should have been introduced, were generated during a visit to Boone Convenient Care, a walk-in urgent care clinic. While we recognize that Victim was examined by a physician, in response to her disclosure of sexual abuse, the jury could reasonably give diminished weight to this examination, given that it was not conducted by individuals specifically trained to address sexual abuse allegations. Further, it is significant that Dr. Eden, who conducted Victim's examination at BCC, was not called to testify at the PCR Hearing, and it is therefore unknown how intensively she conducted her examination, and therefore how much weight to give to her failure to note physical findings.

Finally, it is significant that the SAFE examinations did not conclusively identify physical indications of abuse. Walters, the nurse who conducted the SAFE examination on July 15, 2013, testified that her physical findings were "inconclusive" for abuse. Although Dr. Monroe testified that Victim's observed injuries were not the result of accident, she likewise did not definitively opine that those injuries had been caused by sexual abuse.

We do not find a reasonable probability that but for trial counsel's failure to offer the BCC records into evidence the outcome of trial would have been different. The motion court's determination that any deficient performance by trial counsel prejudiced Hook was clearly erroneous.

Point III is granted.

### Point IV – DNA Report

In Point IV, the State contends that the motion court clearly erred in granting relief on Hook's claim that trial counsel was ineffective for failing to object to admission of the State's

31

DNA report.[9]  Because we find the admission of the report was not prejudicial to Hook's case, we agree.

Preliminarily, the State has not included the DNA report in the record on appeal or in its appendix.  "Rule 29.15 proceedings are governed by the Missouri Rules of Civil Procedure." *Evans v. State*, 70 S.W.3d 483, 486 (Mo. App. W.D. 2002); Rule 29.15(a).  Rule 81.12 governs the requirements for the record on appeal.  *Id.*  Rule 81.12(e) provides that the "[a]ppellant is responsible for depositing all exhibits that are necessary for the determination of any point relied on."  *Esparza v. State*, 518 S.W.3d 269, 273 (Mo. App. W.D. 2017); (quoting Rule 81.12(e)).  "Exhibits not filed with the appellate court are taken as favorable to the trial court's ruling and unfavorable to movant."  *Kennedy v. State*, 771 S.W.2d 852, 854 (Mo. App. S.D. 1989).  We review the record presented.  *Id.*

At pre-trial conference on the day of trial, the State announced a stipulation to Bolinger testifying in place of Jimenez, the preparer of the DNA report.  At trial, Bolinger testified regarding the findings of the DNA report, as detailed above.  Essentially, that the DNA results from the testing on the stain from Hook's couch cushion were consistent with Hook and an undetermined female, not the Victim.  The DNA report was admitted into evidence without objection as State's Exhibit 43.

At the PCR hearing, trial counsel testified that he was not challenging the DNA because he thought the DNA evidence was not harmful to Hook as it showed his DNA and another female, not the Victim.  When asked whether he knew about the holdings in *Bullcoming v. New Mexico,*

---

[9]The State also included in its point relied on that the motion court erred in granting the claim that trial counsel was ineffective for failing to object to the testimony by the preparer's supervisor, Bolinger.  However, the Judgment reflects that the motion court only granted relief on the claim that trial counsel was ineffective for failing to object to the DNA report.  While the motion court referred to trial counsel's stipulation to the Bolinger testimony it did not find it as a ground for ineffective assistance of counsel.

131 S.Ct. 2705, 180 L.Ed. 2d 610 (2011) and *State v. March,* 216 S.W.3d 663 (Mo. 2007), trial counsel stated that he did and that he "could have shut it down if [he] wanted."  When asked if he had a trial strategy for not objecting to the DNA report, trial counsel answered affirmatively and stated that he wanted that report as he did not view it as harmful to Hook and he did not want two to three hours of DNA testimony.

Notwithstanding trial counsel's testimony at the PCR hearing, the motion court found that "for some unknown reason . . . [trial counsel] did not object to the DNA report . . .The DNA report was hearsay, testimonial in nature, and a complete violation of [Hook's] due process."  The motion court cited the United States Supreme Court and Missouri Supreme Court authority finding that lab reports constitute testimonial evidence and its admission without the author's testimony violates the Confrontation Clause.  *Bullcoming v. New Mexico*, 131 S.Ct. 2705, 180 L.Ed. 2d 610 (2011) and *State v. March,* 216 S.W.3d 663 (Mo. 2007).  The motion court found that trial counsel testified at the PCR hearing that he was aware of the holdings in these cases and did not have a trial strategy for failing to object to the DNA report.  The motion court found trial counsel deficient for failing to object to the DNA report in that "[n]o reasonably competent attorney would have allowed the DNA report to be entered into evidence absent the proper foundational requirements."

"'On a claim of ineffective assistance of counsel, the motion court is free to believe or disbelieve any evidence, whether contradicted or undisputed.'"  *Arata v. State,* 509 S.W.3d 849, 852 (Mo. App. S.D. 2017) (citation omitted).  "We defer to the motion court's credibility determinations."  *Id*.  Here, in finding trial counsel deficient, the motion court clearly did not believe trial counsel had a reasonable trial strategy for failing to object to the DNA report and we must defer to that determination.

As for the prejudice prong, the motion court found Hook was prejudiced by trial counsel's deficient performance because the DNA report provided corroborating evidence to the Victim's allegations and Det. Whearty's[10] theory of the case. We disagree. We fail to find that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*

First, the DNA report indicated positive results for Hook and an unidentified female, not the Victim. Such a report does not prejudice Hook in that it in no way infers that Hook was with Victim on the couch and does not support Victim's account of the alleged crime. In fact, its inference is contrary to such account; it infers that Hook had sexual relations with another female on the couch.

Even if trial counsel had objected to the DNA report and it had not been admitted, Bolinger's testimony regarding the contents of the DNA report remained. Moreover, the Victim gave consistent disclosures to multiple people who testified at trial including Grandmother, Foster Mother, and Eibel. The two recordings of the forensic interviews with the Victim in which she described what Hook had done to her were also admitted. The Victim testified that she remembered what Hook did to her and her handwritten note describing it was admitted into evidence. In addition, Walters testified that the injury she observed to Victim, while not conclusive of abuse, would be consistent with abuse. And, Det. Whearty testified that pornographic video was obtained where Victim had reported it to be which depicted the sexual acts she had described. Therefore, in light of the record, we do not find a reasonable probability that but for trial counsel's

---

[10]The motion court did not elaborate on what was meant by Det. Whearty's theory of the case. Our review of the record and Det. Whearty's testimony reflects that he obtained and executed the search warrant at Hook's house, collected the stain cushions from Hook's couch for testing and the pornographic tape from Hook's house. Neither party address this in their briefs.

failure to object to the DNA report the outcome would have been different and consequently find the motion court clearly erred in finding otherwise.

Point IV is granted.

## Conclusion

We reverse the judgment of the motion court.

_____

W. DOUGLAS THOMSON, JUDGE

All concur.